**FIFTH DIVISION**
**MCFADDEN, P. J.,**
**HODGES and PIPKIN, JJ.**

**NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

**February 13, 2026**

# In the Court of Appeals of Georgia

A25A1967. TRUE NORTH CONSTRUCTION GROUP, INC. v.
    D6 STRUCTURAL GROUP, LLC.

HODGES, Judge.

Following a bench trial, True North Construction Group, Inc. ("True North") appeals from the trial court's judgment finding D6 Structural Group, LLC ("D6") not liable for walking off a job that it had contracted with True North to complete. The trial court determined that True North was liable for damages for breaching the contract with D6, and only awarded nominal damages to True North for D6's failure to properly identify other subcontractors in its subcontractor affidavit, which resulted in a lien being filed against the property. True North contends that the trial court erred in its valuation of the contract, its calculation of damages, and in finding no evidence of anything other than nominal damages resulting from the false affidavit that

D6 submitted. For the following reasons, we affirm the trial court's judgment on liability, reverse the trial court's order on the amount of damages, and remand the case to the trial court with direction.

> While we apply a de novo standard of review to any questions of law decided by the trial court, factual findings made after a bench trial shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of witnesses. Because the clearly erroneous test is in effect the same standard as the any evidence rule, appellate courts will not disturb fact findings of a trial court if there is any evidence to sustain them.

*Memar v. Jebraeilli*, 303 Ga. App. 557, 558 (694 SE2d 172) (2010) (citation omitted). So viewed, the following facts are supported by the record.

True North was the general contractor for a project to build a 160-unit senior living facility, and subcontracted with D6 to do the framing on the project. While D6 originally sent True North a higher bid, True North encouraged D6 to come down to the round number of $2.3 million. D6 negotiated with a lumber supplier, Shelter Products, for the costs of materials to get its bid down to that amount. D6 then contracted with Shelter Products to pay for all of the materials on the project, with the locked-in price contingent on D6 taking delivery of the materials by May 1, 2017. If D6

failed to take delivery of the materials by that date, it would be subject to cancellation of the contract or monetary penalties.

Because of delays, True North did not allow D6 to begin work on the site or take delivery of the materials until October of 2017; for example, there was a delay because the slabs were not completed timely. None of the delays, however, were caused by D6. Since D6 did not take delivery of the material as required by the contract, D6 was liable to Shelter Products for $120,000 in penalties. D6 met with the project manager and other officials from True North to discuss the consequential price increases, and D6 and True North agreed to split the extra costs. Additionally, in order to control the cost, True North agreed to pay Shelter Products directly for the materials. Because of the increase in material costs, and additional expenses the project required, the total value of the contract increased by more than $94,552.50, for a total contract value of $2,394,552.50. [1]

---

[1] Both True North and D6 contend that the trial court's valuation of the entire contract, after incorporating the value of the change orders, is incorrect by approximately $300. The allegedly incorrect total was the product of the trial court relying on a document prepared by True North, which asserted the value of the change orders was $94,552.50. Because the document the trial court relied on is in the record, we will continue to use the valuation employed by the trial court. *Memar*, 303 Ga. App. at 558.

True North paid Shelter Products directly for the materials, worth $1,168,940.61. For the remainder of the contract, True North paid D6 for its labor, subject to retainage. Retainage under the contract allowed True North to hold back ten percent of the money due to D6 to ensure the work was completed and issues were resolved before the full amount was paid. After D6 was allowed to begin work, it submitted bi-monthly pay applications for periodic progress payments for its labor. D6 submitted eight pay applications that True North paid, totaling $932,743.95, which was the value of the work D6 had completed minus the ten percent retainage for its labor. Despite having no issues with the work done by D6, on March 16, 2018, True North determined it would not be making any further payments to D6 because it believed that D6 was not entitled to any further payment under the contract. Instead, True North told D6 that it would need to finish the job without any further payment. D6 worked for another ten days on the project in the hope that the parties could work out the payment issue. D6 was unsuccessful in resolving the dispute and walked off the job site on March 26, 2018. At the time D6 walked off the job, its work was roughly 90 percent complete.

Under the parties' contract, D6 agreed "to continue to perform the [w]ork despite the existence of disputes. The existence of a dispute shall not be grounds for any failure to perform by [D6] nor limit the rights of [True North] to proceed, in good faith, to remedy any default by [D6]." D6 and True North, however, also agreed that D6 would not have to continue performance if timely payments were not made. Specifically, the contract provided that

> [D6] shall be paid bi-monthly progress payments on or before the 1st & 15th of each month for the value of work completed minus 10% for retainage. [True North] will make all payments for stored materials monthly directly to [Shelter Products]. No provision of this agreement shall serve to void [D6's] entitlement to payment for properly performed work or suitably stored materials or to require [D6] to continue performance if timely payments are not made to [D6] for suitably performed work or stored materials or to void [D6's] right to file a lien or claim on its behalf in the event that any payment to [D6] is not timely made.

After walking off the project, D6 sought to exercise its rights under the agreement and filed a lien against True North.

True North subsequently contracted with others to finish the work, resulting in $92,792.43 in additional labor charges. True North also spent $85,674.00 in bond

premiums because of the liens on the project. Seeking these expenses and other damages, True North filed suit against D6 for breach of contract. D6 answered the complaint and sought payment for the work it completed.[2] The case proceeded to a bench trial, where the trial court found that D6 did not breach the contract by walking off the job as True North had failed to make timely payments that it owed. The trial court set forth the following calculations:

Total contract value:

$2,394,552.50

Minus payments to Shelter Products:

$1,168,940.61

Equals contract value to D6:

$1,225,611.90

90 percent of contract value for the work completed:

$1,103,050.70

---

[2] D6 raised other claims against other parties in its answer as well. These claims and parties are not part of this appeal.

Reduced by the ten percent retainage on labor:

$992,745.63

Minus what D6 had been paid under the contract:

$932,743.95

Equals amount owed to D6 when it walked off the job:     $60,001.68

Because the trial court determined that True North owed D6 money when it walked off the job, it concluded that D6 was not liable to True North for breach of contract, as D6 was authorized to stop performing under the contract if True North failed to make timely payment for work completed. Instead, under the contract, the trial court found that D6 was entitled to damages. The trial court subtracted the amount D6 had been paid ($932,743.95) from 90 percent of the contract value for the work D6 had completed ($1,103,050.70) for damages in the amount of $170,306.80. While unclear from the trial court's order, this $170,306.80 appears to represent the $60,001.68 due to D6 plus the ten percent of total labor costs that True North had retained under the contract. After applying seven percent per annum simple interest

7

to the $170,306.80 figure, the trial court determined that D6 was owed a total of $249,053.32.

The trial court also found that D6 was liable to True North for submitting a false subcontractor's affidavit, discussed below in Division 2, but awarded only nominal damages, because, according to the trial court, there was no evidence of what fraction of the $85,674.00 that True North paid in bond premiums was attributable to D6's false affidavit. True North appeals.

1. In related enumerations of error, True North contends that the trial court erred in its determination that D6 did not breach the contract by walking off the job. True North also asserts that even if D6 did not breach the contract, the trial court erred in its determination of damages. For the following reasons, we find that the trial court's determination that D6 did not breach the contract is supported by the evidence, but reverse the amount of damages because no evidence supports the amount the trial court awarded.

(a) True North argues that D6 did breach the contract because D6 was not owed any money when it walked off the job. To support that conclusion, True North argues that entire total value of the contract must be subject to the completion

8

percentage (90 percent), not just the labor portion. True North points to multiple expert witnesses who testified that this was the proper methodology. Under this methodology, D6 would not have been owed money when it walked off the job. The trial court, however, found that the parties modified their agreement by their conduct and that they bifurcated the contract into the materials portion and the labor portion. Under this construction, the trial court only applied the completion percentage to the value of the labor. True North has not challenged the trial court's legal determination that the contract was modified by the performance of the parties, instead asserting that the trial court's methodology was not supported by the evidence. As such, we must determine if there was any evidence to support the trial court's valuation of the contract. *Memar*, 303 Ga. App. at 558.

The president of D6 testified that the proper construction under the agreement would remove the costs of materials before calculating the value of the contract to D6. While True North complains that such a valuation contradicts all of the evidence that it presented at trial, the trial court was free to credit the testimony of D6's president over True North's witnesses. *SPI Holdco v. Mookerji*, 361 Ga. App. 449, 460(2) (864 SE2d 633) (2021) ("Again, the trial court is the trier of fact in a bench trial, and its

9

findings will be upheld on appeal if there is any evidence to support them.") (citation and punctuation omitted). Crediting D6's president's testimony, the trial court had evidence to support removing the value of material costs before determining the value of the work completed by D6. As set forth above, under such a valuation, D6 was owed payment. Thus, there was evidence to support the trial court's valuation of the contract, and that D6 was owed payment when it walked off the job. Because D6 was authorized under the contract to cease performance if timely payment was not made, the trial court did not err in concluding that D6 did not breach its contract by doing so.

(b) This determination does not end our inquiry, however, because True North contends that even if it was liable to D6, the trial court erred in its calculation of damages. After the trial court concluded that D6 was owed $60,001.68 when it walked off the job, it went on to conclude that D6 was entitled to $170,306.80 plus interest, totaling $249,053.32. As noted above, however, payments owed to D6 were subject to ten percent in retainage. True North argues that there was no evidence to support the trial court's conclusion that D6 was entitled to retained funds, as D6 did not satisfactorily complete the project. D6 has not directed this Court to any record

evidence demonstrating it was entitled to the retained funds. See *Shahid v. Esaam*, 376 Ga. App. 145, 149(1) n. 14 (918 SE2d 198) (2025) ("If an appellee disagrees with the appellant's statement of the case in whole or in part, the appellee must identify any points of disagreements with supporting citations to the record."), quoting Court of Appeals Rule 25(b). "This Court will reverse the trial court's judgment in a non-jury trial where it is apparent that the judgment rests on erroneous reasoning or on an erroneous legal theory." *Memar*, 303 Ga. App. at 562(2)(b). Because there was no evidence that D6 was entitled to the retained funds, we reverse the trial court's calculation of damages and remand this case with direction for the trial court to enter an order that either (1) points to the evidence it relied on to find D6 is entitled to the retained funds or (2) recalculates the damages award and explains how the evidence supports such an award.[3] Id.

---

[3] True North enumerates as error the allegedly incorrect value of the change orders discussed in footnote 1, supra. Because this difference of $300 does not affect liability, this can be addressed on remand. Additionally, we have observed that there are seemingly math errors contained in the trial court's order that, while not affecting the trial court's ultimate determination regarding liability, should be corrected on remand. The trial court should reconsider what total value of the contract was supported by the evidence.

2. True North also challenges the trial court's conclusion that it was entitled to only nominal damages resulting from D6 filing a false subcontractor affidavit. True North produced at trial a "Subcontractor's Interim Affidavit Upon Payment" signed by D6, which attested that it had named all subcontractors that had furnished services on the project, and that all subcontractors had been paid in full for all work that was performed. D6 agreed to indemnify True North for all losses, costs, damages or expenses by reason of any liens arising out of D6's work. D6, however, did not identify its subcontractor P&H, and after D6 walked off the job, both D6 and P&H filed liens on the subject property. After D6 and P&H filed their liens, True North spent $85,674.00 in bond premiums for the liens.

Because D6 failed to identify P&H on this affidavit, the trial court found it liable to True North for any expense regarding the procurement of bonds on the lien placed by P&H, a conclusion D6 does not challenge on appeal. The trial court, however, went on to find that there was no evidence presented regarding what percentage, if any, of the $85,674.00 premium was attributable to just the P&H lien and awarded only nominal damages, a finding that True North takes great issue with. True North points to testimony in the record that it paid an annual premium of $14,997.00 because of the

12

P&H lien. It is unclear from the trial court's order if it considered this evidence in any way before determining that there was no evidence of specific damages resulting from the P&H lien. Because True North provided at least some evidence of annual premiums attributable to the P&H lien, the trial court's finding that there was no such evidence cannot be supported by the record. If the trial court makes a finding of fact which is unsupported by the record, as here, that finding cannot be upheld, and any judgment based upon such a finding must be reversed. *Anderson v. Kaye*, 371 Ga. App. 626 (901 SE2d 765) (2024). Accordingly, we reverse the award of only nominal damages and remand the case for the trial court to consider whether or not the evidence True North provided of annual premiums related to the P&H lien supports an award of actual damages.

*Judgment affirmed in part, reversed in part, and case remanded with direction. McFadden, P.J. and Pipkin, J., concur.*